No. 14-1266

IN THE

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT

ALCOHOL MONITORING SYSTEMS, INC.

*Plaintiff / Appellant,*

VS.

BI INCORPORATED AND GEO CARE, INC.

*Defendants / Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO, HON. DAVID M. EBEL
CASE NO. 11-CV-00301-DME-CBS

## APPELLEES' BRIEF

MICHAEL P. MANNING
HOLLAND & HART LLP
401 N. 31st St., Suite 1500
P.O. Box 639
Billings, MT 59103
Telephone: (406) 252-2166
Fax: (406) 252-1669
mpmanning@hollandhart.com

TIMOTHY P. GETZOFF
HOLLAND & HART LLP
One Boulder Plaza
1800 Broadway, Suite 300
Boulder, CO 80302
Telephone: (303) 473-2700
Fax: (303) 473-2720
tgetzoff@hollandhart.com

*Counsel for Appellees*

# CERTIFICATE OF INTEREST

Counsel for Appellees BI Incorporated and Geo Care, Inc. certify

the following:

    **1.    The full name of every party represented by us is:**

BI Incorporated and Geo Care, Inc.

    **2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:**

Not applicable.

    **3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by us are:**

The GEO Group, Inc.

    **4.    The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:**

| | |
|---|---|
| Michael P. Manning | Timothy P. Getzoff |
| HOLLAND & HART LLP | Donald A. Degnan |
| 401 N. 31st St., Suite 1500 | HOLLAND & HART LLP |
| P.O. Box 639 | One Boulder Plaza |
| Billings, MT  59103 | 1800 Broadway, Suite 300 |
| | Boulder, CO  80302 |

Dated:  February 6, 2015

                       */s/ Michael P. Manning*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................... i

TABLE OF CONTENTS ............................................................. ii

TABLE OF AUTHORITIES ........................................................ v

STATEMENT OF RELATED CASES ...................................... 1

JURISDICTIONAL STATEMENT ........................................... 2

STATEMENT OF THE ISSUES ............................................... 2

STATEMENT OF THE CASE ................................................... 4

    A.    BI's Background in the Electronic Monitoring Industry .................................................................... 5

    B.    AMS's Patents ............................................................ 7

        1.    The '149 Patent ............................................... 7

        2.    The '611 Patent ............................................... 9

    C.    BI's TAD System ..................................................... 10

        1.    The BI TAD Device ...................................... 11

        2.    Transmission from the TAD Device to the HomeBase Modem ....................................... 12

        3.    Transmission from the HomeBase to the Host ............................................................... 14

        4.    The Host's Processing of Alerts .................... 14

    D.    Proceedings Below .................................................. 17

        1.    BI's Summary Judgment Motion .................. 17

        2.    AMS's Rule 59(e) Motion ............................. 19

SUMMARY OF THE ARGUMENT ........................................................ 24

ARGUMENT ..................................................................................... 30

I.    Standard of Review ..................................................................... 30

II.   AMS Waived Any Challenge to Nearly All the District
      Court's Rule 59(e) Rulings ........................................................ 30

III.  The District Court Correctly Granted Summary
      Judgment of Non-Infringement of the '149 Patent ...................... 35

      A.    The BI TAD System Does Not Satisfy the First
            Schedule Limitation ........................................................ 36

            1.    The District Court Consistently Interpreted
                  "Said First Schedule" ............................................ 37

            2.    The District Court's Interpretation of "Said
                  First Schedule" Was Correct .................................. 38

                  a.    The Claim Language Supports the
                        District Court's Holding ................................ 38

                  b.    The Specification Supports the
                        District Court's Holding ................................ 41

                  c.    The Prosecution History Supports the
                        District Court's Holding ................................ 42

            3.    Because the District Court's Interpretation
                  of "Said First Schedule" Was Correct, Its
                  Grant of Summary Judgment Was Also
                  Correct ................................................................ 44

      B.    The BI TAD System Does Not Satisfy the Second
            Schedule  Limitation ........................................................ 45

            1.    There Are No Genuine Fact Issues ........................... 45

            2.    BI Argued the "Predetermined Time
                  Interval" Element Below ........................................ 49

IV.   The District Court Correctly Granted Summary
       Judgment of Non-Infringement of the '611 Patent ....................... 53

       A.    Construction of the Historical Data Limitation .................... 53

       B.    Applying the Properly Construed Claim, BI's TAD
             System Indisputably Does Not Meet the Historical
             Data Limitation ..................................................................... 54

       C.    AMS Waived Its New Arguments About
             Construction of the Word "Message" ................................... 57

       D.    The District Court Did Not Abuse Its Discretion
             by Finding that AMS Waived Its Argument that
             Claim 7 Untethered the Situation Analyzer from
             the Historical Data Limitation ............................................ 61

CONCLUSION ...................................................................................... 65

CERTIFICATE OF SERVICE ............................................................... 67

CERTIFICATE OF COMPLIANCE ...................................................... 68

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alcon Research Ltd. v. Barr Labs., Inc.*,
   745 F.3d 1180 (Fed. Cir. 2014) ........................................... 30

*Barber v. Colo. Dep't of Rev.*,
   562 F.3d 1222 (10th Cir. 2009) .................................... 30, 62

*Butler v. Kempthorne*,
   532 F.3d 1108 (10th Cir. 2008) ............................... 30, 32, 61

*Cephalon, Inc. v. Watson Pharm., Inc.*,
   707 F.3d 1330 (Fed. Cir. 2013) .............................. 35, 36, 44

*Chef America, Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004) ........................................... 42

*Chimie v. PPG Indus., Inc.*,
   402 F.3d 1371 (Fed. Cir. 2005) ........................................... 43

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
   460 F.3d 1349 (Fed. Cir. 2006) ........................................... 58

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
   672 F.3d 1270 (Fed. Cir. 2012) ........................................... 58

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*,
   214 F.3d 1302 (Fed. Cir. 2000) ........................................... 43

*Engel Indus., Inc. v. Lockformer Co.*,
   166 F.3d 1379 (Fed. Cir. 1999) .................................... 34, 44

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008) ...................................................... 23, 31

*Gentry Gallery, Inc. v. Berkline Corp.*,
   134 F.3d 1473 (Fed. Cir. 1998) ........................................... 41

*Grynberg v. Total S.A.*,
538 F.3d 1336 (10th Cir. 2008) ........................................................ 31

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc) ..................................... *passim*

*N. Am. Container v. Plastipak Packaging, Inc.*,
415 F.3d 1335 (Fed. Cir. 2005) ....................................................... 42

*Pause Tech., LLC v. TiVo, Inc.*,
419 F.3d 1326 (Fed. Cir. 2005) ....................................................... 48

*Phelps v. Hamilton*,
122 F.3d 1309 (10th Cir. 1997) ...................................................... 30

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................ 38, 39, 41, 42

*Polk v. Soc. Sec. Admin., Comm'r*,
579 F. App'x 843 (11th Cir. 2014) ................................................... 60

*Raylon, LLC v. Complus Data Innovations, Inc.*,
700 F.3d 1361(Fed. Cir. 2012) ................................................... 40, 44

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ................................. 34, 35, 44, 52, 60

*Steele v. Young*,
11 F.3d 1518 (10th Cir. 1993) .................................................... 32, 33

*Tolbert v. Queens Coll.*,
242 F.3d 58 (2d Cir. 2001) ............................................................. 34

## Statutes and Rules

28 U.S.C. § 1338(a) .......................................................................... 2

35 U.S.C. § 103 ............................................................................. 8, 10

Fed. Cir. R. 28(b) ........................................................................ 2, 17

Fed. Cir. R. 47.5 ............................................................................... 1

Fed. R. App. P. 4(a)(4)(B)(ii) ........................................................... 35

Fed. R. App. P. 28(a)(4)(A) .......................................................... 2

Fed. R. App. P. 32(a)(7)(B) ...................................................... 67

Fed. R. Civ. P. 11 ...................................................................... 40

Fed. R. Civ. P. 59 ............................................................... *passim*

Fed. R. Civ. P. 59(e) .......................................................... *passim*

## Other Authorities

American Heritage Dictionary 1143 (New College ed. 1979) ................ 39

Bureau of Justice Statistics, Corrections Statistical Analysis
    Tool – Prisoners, Yearend custody population (1999-2013),
    *available at* http://www.bjs.gov/index.cfm?ty=nps (last
    visited Feb. 4, 2014) ................................................................ 4

Erinn J. Heberman, Ph.D. & Thomas Bonczar, Probation
    and Parole in the United States, 2013 (Oct. 2014) ............................ 4

National Institute of Justice, IN Short, Toward Criminal
    Justice Solutions (Sept. 2011), *available at*
    https://www.ncjrs.gov/pdffiles1/nij/234460.pdf (last visited
    Feb. 4, 2014) ......................................................................... 4

## STATEMENT OF RELATED CASES

No other appeal in or from this civil action was previously filed before this or any other appellate court, and Appellees BI Incorporated and Geo Care, Inc. (collectively, BI) are not aware of any case that will directly affect or be directly affected by this Court's decision. *See* Fed. Cir. R. 47.5.

# JURISDICTIONAL STATEMENT

BI includes a jurisdictional statement only to recite that the district court had jurisdiction under 28 U.S.C. § 1338(a).  *See* Fed. R. App. P. 28(a)(4)(A).  BI otherwise agrees with Appellant Alcohol Monitoring Systems, Inc.'s (AMS) jurisdictional statement.  *See* Fed. Cir. R. 28(b).

# STATEMENT OF THE ISSUES

1.    Where the district court found that AMS waived ten substantive arguments by raising them for the first time in a Rule 59(e) motion, whether AMS subsequently also waived any challenge to nine of the court's ten waiver findings by failing to argue in its opening brief that they constituted an abuse of discretion.

2.    Where one of the '149 Patent's claim limitations requires a device that takes transdermal alcohol concentration readings according to a "first schedule" and transmits them to a modem according to "said first schedule," whether the district court correctly interpreted "said first schedule" to mean the "same first schedule" and thus correctly granted summary judgment in BI's favor as to non-infringement of the '149 Patent.

3.    Where the undisputed evidence was that the accused product transmits transdermal alcohol concentration readings from a modem to a central monitoring network immediately upon receipt—and thus at varying, indeterminate intervals rather than at "predetermined time intervals according to a second schedule," as required by the '149 Patent's claim limitations—whether the district court correctly granted summary judgment in BI's favor as to non-infringement of the '149 Patent on that alternative basis as well.

4.    Whether the district court correctly granted summary judgment in BI's favor as to non-infringement of the '611 Patent in light of the parties' stipulated construction of the claim term "historical data," AMS's failure to rebut BI's evidence that the accused product does not query historical data, and AMS's waiver of several new arguments.

5.    Whether the district court abused its discretion by finding that AMS waived its argument that claim 7 of the '611 Patent is broader than claim 1 because it could have raised that argument on summary judgment but failed to do so.

# STATEMENT OF THE CASE

There are almost 1.5 million people incarcerated in the United States and another 4.75 million subject to some form of community supervised release. *See* Bureau of Justice Statistics, Corrections Statistical Analysis Tool – Prisoners, Yearend custody population (1999-2013), *available at* http://www.bjs.gov/index.cfm?ty=nps (last visited Feb. 4, 2014); Erinn J. Heberman, Ph.D. & Thomas Bonczar, Probation and Parole in the United States, 2013 (Oct. 2014).  To deal with numbers of that magnitude, the criminal justice system has increasingly turned to remote electronic monitoring—a tool that significantly reduces an offender's rate of recidivism and is about six times cheaper than imprisonment.  *See* National Institute of Justice, IN Short, Toward Criminal Justice Solutions (Sept. 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/234460.pdf (last visited Feb. 4, 2014).

This case involves a dispute over technology underlying some of the remote electronic monitoring devices used by courts and law enforcement to keep track of releasees.  Both BI and AMS market and sell systems that utilize bracelets—usually worn on an offender's ankle—that not only monitor the offender's presence at home, but also can detect the alcohol content of the offender's perspiration.  The

4

parties' sole dispute is whether BI's TAD monitoring system infringes two of AMS's patents. As the district court correctly concluded, it does not.

## A.    BI's Background in the Electronic Monitoring Industry

Since the mid-1980s, BI has used radio frequency technology in electronic monitoring systems designed to track criminal offenders subject to some form of supervised release. A1452-53. BI's early systems used a unit comprised of a transmitter worn by the offender and a field monitoring device installed in the offender's residence. A1453. The unit communicated with a host computer through phone lines and monitored the offender's schedules and curfews by detecting the offender's presence or absence in the residence. *Id.*

Many of the basic principles on which BI based those early systems still apply today. *Id.* Over the years, however, BI has developed smaller, more powerful, and much more sophisticated technology. *Id.* For example, to combat the inherent problem of an unsupervised offender trying to remove a monitoring device, BI created patent-protected technology that detects any attempt to tamper with or remove the device and can send a message to a central monitoring

computer to alert a monitoring agency of the attempt. *Id.*; *see also* A0237-57.

BI began using alcohol detection with its remote monitoring devices in 1990. A1453. BI's first generation product incorporated radio frequency technology to transmit the results of an unsupervised breath alcohol test to a central computer, while also transmitting voice data to allow the monitoring agency to verify the identity of the person providing the sample. A1453-54. In 1994, BI developed its second generation product, which incorporated a host of new technology that allowed the device to collect data on alcohol readings, analyze it, and transmit it to the central computer, where alerts or messages could be created in response to the data. A1454. BI introduced its third generation alcohol breath analyzer, the BI Sobrietor, in 1999. *Id.* Building on its predecessors, the BI Sobrietor—which is still in use today—allows a user to schedule testing at regular intervals, randomly, or on-demand. *Id.* It reports test results falling outside predetermined parameters (*e.g.*, an alcohol reading above .02 percent) at different alarm levels—either immediately by fax, phone or pager, or on a less urgent basis in a daily summary report. *Id.*

## B.    AMS's Patents

In the late 2000s, AMS obtained two patents for technology related to remote blood alcohol monitoring:  U.S. Patent No. 7,462,149 (the '149 Patent), which issued on December 9, 2008, and U.S. Patent No. 7,641,611 (the '611 Patent), which issued on January 5, 2010. A0087, 0112.

### 1.    The '149 Patent

The '149 Patent's claims generally relate to a device strapped to a wearer's ankle that collects and transmits transdermal alcohol concentration (TAC) readings.  *See* A0108-111.  According to the independent claims, the device takes TAC readings from a human subject and transmits those readings wirelessly to a modem, which in turn transmits them to a central monitoring network for processing and determination of whether an alert condition exists.  *Id.*; *see also* A5587-88 (reciting claims 1 and 18, the '149 Patent's two independent claims).

Two separate limitations of the '149 Patent's claims are relevant here, as each formed an alternative basis for the district court's summary judgment ruling.  The first limitation (the First Schedule Limitation) requires that the monitor device take "a plurality of transdermal alcohol concentration readings at predetermined time

7

intervals according to a first schedule stored in a first memory" within the device and then communicate those TAC readings to a modem "at predetermined time intervals *according to said first schedule*." A0108 (16:52-65), A0110 (19:22-32) (emphasis added). The second limitation (the Second Schedule Limitation) requires that the modem communicate the TAC readings to the monitor network at "predetermined time intervals according to a second schedule" stored in the modem. A0109 (17:4-8), A0110 (19:34-39).

During the original prosecution of the '149 Patent, the Patent and Trademark Office (PTO) issued a final rejection of all the claims as being obvious under 35 U.S.C. § 103 in view of the prior art. A5942-65; A5969 (26:3-27:11). In response, AMS's inventors amended the claims and added the First Schedule and Second Schedule Limitations. A5979, 83. The inventors admittedly made the amendments for reasons of patentability, arguing that the additional limitations distinguished the claims from the prior art. A5969 (27:12-19); A6014-20.

The PTO eventually issued the '149 Patent with the First and Second Schedule Limitations added to independent claims 1 and 18. In doing so, the PTO Examiner specifically cited the new limitations as "reasons for allowance" of the claims. A6028-29.

8

### 2.    The '611 Patent

The '611 Patent's claims also relate to the collection and transmission of data from a person wearing a device strapped to his or her ankle, but more specifically pertain to the processing and analysis of the data once it arrives at the central monitoring network.  *See* A0133-35.  In sum, the patent claims a system that first parses the raw data received by the central monitoring network into alert messages and then consults workflow instructions and historical data to determine what action to take—for example, sending a notification to a probation officer.  *Id.*; *see also* A5615-16 (reciting claims 1 and 7, the '611 Patent's two independent claims).

All the '611 Patent's claims require that, after a "situation analyzer" parses the data into alert messages, the situation analyzer queries "historical data" relating to *past* messages to determine the action to apply to each *current* message (the Historical Data Limitation).  *See* A5615-16; *see also* A0065.  As explained in the specification, querying historical data provides a distinct benefit—it allows the system to know whether the alert message is a first offense or a repeat offense, which can then be taken into account in

determining whether to escalate or change the action to apply to the alert message. *See* A0132 (13:12-37).

As with the '149 Patent, the PTO initially rejected all the '611 Patent's claims as obvious under 35 U.S.C. § 103 in view of the prior art. A6032-47; *see also* A5970 (33:20-34:25). In response, AMS's inventors amended the claims and added the Historical Data Limitation for patentability reasons, arguing that the additional limitation distinguished the claims from the prior art. A5970 (35:4-36:8); A6051, 53, 60-62. The PTO eventually issued the '611 Patent with the Historical Data Limitation added, A6069, and the PTO Examiner specifically cited the addition of the limitation as a "reason for allowance," A6073-74.

## C.     BI's TAD System

BI released its TAD system—the accused product in this litigation—in 2009. A1455. Following the same principles and using the same basic remote monitoring technology that BI has used for more than a decade, *id.*, the BI TAD system consists of three parts: (1) the BI TAD device, an ankle-worn device that collects data from the subject; (2) BI's standard HomeBase modem, which is installed in the subject's residence; and (3) the Host, a centralized collection of databases and

10

processors that receives data from the HomeBase modem, determines whether an "event" (or alert message) exists, and can send notification of the event to a pre-designated corrections or supervising officer. *See* A5684-85.

### 1. The BI TAD Device

The TAD device monitors and records several types of data, including curfew data (*i.e.*, the times the wearer is within range of the modem), tamper data such as whether a strap has been cut, and TAC data. *See* A5692-93. To record TAC data, the device contains a sensor that continuously monitors for the presence of alcohol. *See* A5684. The sensor records TAC readings according to a predetermined schedule of once every minute. A5686-90; A5922; A6085-86 (32:17-33:6). The TAD device, however, does not communicate the TAC readings to the HomeBase modem according to the same one-minute schedule on which it takes them from the wearer. In fact, the device never communicates the one-minute TAC readings to the modem at all. A5922; A5686-88. Instead, after five minutes, the device calculates and stores the average of five consecutive readings (the TAC average), and dumps the original one-minute readings from memory. A5922; A6085-86 (32:24-34:14).

### 2. Transmission from the TAD Device to the HomeBase Modem

With one exception (discussed below), the TAD device does not communicate the five-minute TAC averages to the HomeBase modem at predetermined time intervals according to a schedule. A5924; A6090 (51:7-20). Rather, the transmissions from the TAD device to the modem are event-based, depending on the level of the TAC reading. *Id.*

The TAD device is programmed with a threshold value of .02 percent, against which it compares the five-minute TAC averages. A5924; A6087 (38:12-39:6); A6089-90 (48:24-49:18, 49:25-51:6). The device's firmware also has a counter that keeps track of the number of times the TAC averages exceed the .02 threshold. *Id.* When the counter reaches twelve, the device attempts to initiate a communication with the HomeBase modem and transmit the TAC data. *Id.* In other words, the device transmits TAC data whenever it records twelve TAC averages that exceed .02. *Id.*

Once the TAD device transmits TAC data, the counter resets to zero and the cycle repeats. A5924. If the counter reaches twelve again, the device will again initiate communication with the HomeBase and, if in range, transmit all the TAC data collected since the prior transmission. *Id.*

12

Because the TAC averages are taken every five minutes, twelve readings above the .02 threshold cannot occur any faster than 60 minutes.  Accordingly, the shortest time interval on which the TAD device is capable of transmitting TAC data to the HomeBase is once every hour.  A5924; A6089 (47:2048:17).  The counter, however, does not require *consecutive* instances of a TAC average exceeding the threshold.  Thus, it may take much longer than an hour for the counter to reach twelve.  As a result, transmission on an hourly basis is not a predetermined time interval programmed into the device; it is simply one possible outcome depending on how long it takes for twelve TAC averages to exceed .02.  *Id*.

The only exception to this protocol is a transmission that may occur due to the "hello timer."  A5754; A5925.  If the device has not transmitted TAC data for four consecutive hours—meaning that the counter has not reached twelve and no tamper events have occurred—the hello timer expires and causes the device to attempt a transmission with the HomeBase.  *Id*.  Of course, the hello timer's four-hour schedule is not the same as the one-minute schedule on which the device takes TAC readings from the wearer.

### 3.    Transmission from the HomeBase to the Host

The HomeBase modem communicates all the TAC data it receives from the TAD device to the Host immediately on receipt.  A5925-26; A6092 (63:20-64:10).  The HomeBase is not programmed with predetermined time intervals that govern its transmission of TAC data, nor does it wait for any predetermined time interval before transmitting TAC data to the Host after receiving it from the TAD device.  A5925-26; A6092-93 (62:21-65:12).

### 4.    The Host's Processing of Alerts

Once data reaches the Host, it moves through a series of processors, which analyze the data and determine whether to generate a violation message.  A5832; A5931.  Data that is *not* TAC-related—such as curfew or tamper data—is sent to one of two processors that compare the data to a set of rules.[1]  *Id.*  Data that *is* TAC data—*i.e.*, the five-minute TAC averages transmitted by the TAD device—is sent to the TAD Processor.  *Id.*

---

[1] If, for example, the data indicates that the TAD strap has been cut or that the wearer was not in range of the HomeBase at a designated curfew time, the processor creates a violation message and places it into an event table.  A5832-35; A5931.

14

The TAD Processor's function is limited.  It applies an algorithm—known as MAD6—to determine whether the incoming stream of TAC averages warrants creation of a violation message.  *Id.*  To make that determination, the TAD Processor relies on only a cluster of the current five-minute TAC averages; it does not access or consider the subject's prior or historical violation messages or any data relating to prior messages.  A5931.  And although the TAD Processor decides whether to create a violation message, it does not determine what action (if any) to apply to the violation message.  A5931; *see also* A5837.

All decisions about the actions to apply to a given violation message are made by yet another processor, the AutoAlertHandler.  A5931.  Every violation message—whether alcohol related or not—is placed in an event table.  The AutoAlertHandler retrieves messages from the table and determines how each message should be handled, based on preferences that are pre-configured by the customer.  A5835-38; A5931-32.  For example, a customer could configure the system to ignore some violation messages, send alerts via e-mail or text message for other messages, and send an escalated alert for messages of a more serious nature.  *See id.*

15

Historical data plays no role in the AutoAlertHandler's function. A5932.[2] To determine how a violation message should be handled, the AutoAlertHandler simply follows the instructions input by the customer. *Id.* The AutoAlertHandler does not query or rely on prior messages or data relating to prior messages. *Id.* Indeed, the AutoAlertHandler lacks the capability to change the action that applies to a particular violation message based on prior messages. *Id.* Rather, when a processor generates a new violation message, the AutoAlertHandler simply queries the customer's pre-selected preferences and assigns an action to the message in accordance with those preferences. *Id.* Likewise, the customer has no ability to configure its notification preferences to take into account historical data related to prior messages. *Id.*

---

[2] AMS's expert essentially ignored and did not substantively address the Historical Data Limitation in his expert report. *See* A5932-33. Thus, BI's expert's opinion on that issue is unrebutted.

### D.    Proceedings Below[3]

### 1.    BI's Summary Judgment Motion

Approximately fourteen months after the district court issued its *Markman* order, after all fact and expert discovery was concluded, BI moved for summary judgment of non-infringement.  A5529-55; *see also* A0041-67.  BI argued that the BI TAD system does not literally infringe the '149 Patent because both the First and Second Schedule Limitations are absent.  A5548-51.  BI also argued that, as a matter of law, AMS could not argue infringement under the doctrine of equivalents because the inventors added the First and Second Schedule Limitations during prosecution in order to secure the patent.  A5551.

Similarly, BI argued that the TAD system does not infringe the '611 Patent because it does not meet the Historical Data Limitation, and the inventors also added that element during prosecution for patentability reasons.  A5551-53.  The district court agreed and granted summary judgment in BI's favor.  A0018-40.

---

[3] BI agrees with AMS's general summary of the procedural history.  *See* Opening Br., at 5-6.  BI, however, disagrees with certain aspects of AMS's summary judgment discussion and AMS omitted any substantive discussion of the Rule 59(e) proceedings.  BI thus limits its discussion of the proceedings below to those issues.  *See* Fed. Cir. R. 28(b).

**The '149 Patent.**  Relying on its *Markman* order, which explicitly stated that "'said first schedule' and 'same first schedule' mean the same thing," *see* A0058, the district court first found it undisputed that the BI TAD system's communication of TAC readings to the HomeBase modem is event-driven and never occurs on the same one-minute schedule on which the TAD device takes the readings.  A0026-30.  The Court thus concluded that the BI TAD system does not meet the '149 Patent's First Schedule Limitation because it does not take TAC data from the subject on the same schedule on which it transmits TAC data to the modem.

The court next found that the BI TAD system does not meet the '149 Patent's Second Schedule Limitation because the HomeBase "simply transmits to the Host any TAC data it receives immediately upon receipt from the TAD [device,]" rather than "at predetermined time intervals according to a second schedule."  A0030-33.  Having found that the BI TAD system does not literally infringe the '149 Patent, the court held that AMS was presumptively estopped from invoking the doctrine of equivalents by prosecution history estoppel and that AMS had not rebutted that presumption.  A0033-36.  Accordingly,

the court entered summary judgment of non-infringement in BI's favor as to the '149 Patent.

**The '611 Patent.**  The district court also entered summary judgment of non-infringement in BI's favor as to the '611 Patent.  The court held that the BI TAD system did not literally infringe the '611 Patent because no part of the system constituted "a situation analyzer that [used] historical data relating to prior messages in deciding what action to apply to the incoming message just received," as required by the Historical Data Limitation.  A0036-38 (citing *Markman* order, A0065-66).  Because AMS did not dispute that prosecution history estoppel applied, the court also found that BI did not infringe under the doctrine of equivalents.  A0038.

## 2.    AMS's Rule 59(e) Motion

In response to the district court's grant of summary judgment, AMS filed a motion to alter or amend under Federal Rule of Civil Procedure Rule 59(e), advancing new claim construction and infringement arguments and citing evidence it did not submit with its earlier briefing.  A6508-27.  Aside from editing its order to reflect a single wording change, the court denied AMS's motion.  A0003-17.  The court held that AMS's motion was largely foreclosed by precedent

holding that a party may not use a postjudgment Rule 59(e) motion to advance arguments that it could have raised in prior briefing or to expand a judgment to encompass new issues for appeal. A0006-7 (citing cases).

**The '611 Patent**. The district court addressed AMS's arguments about the '611 Patent first. The court agreed with AMS that it would have been clearer for the summary judgment order to use the word "message" instead of the word "event" in one sentence and thus amended the sentence accordingly. A0007-8. The court, however, rejected AMS's argument that the court's use of "event" caused it to read the Historical Data Limitation too narrowly. A0009-10.

According to AMS, the court erroneously required the situation analyzer to query historical data for "an action to be applied" only to an "event" or "alert message," instead of to *any* "message." A0009-10; *see also* A6428-29. AMS argued that, on summary judgment, neither it nor its counsel "understood that BI was arguing that infringement was avoided because 'the action to be applied' limitation [of the '611 Patent's Historical Data Limitation] was not satisfied." A6429. AMS claimed it "did not understand that BI was arguing its system never used historical data to determine the action to be applied to messages."

20

A0011.  Based on that alleged misunderstanding, AMS advanced a new

argument in its Rule 59(e) motion that a situation analyzer's assembly

of "sufficient TAC data *messages* to determine if elevated TAC readings

indicate a drinking event or a false positive," is a query of historical

data used to determine "an action to be applied to the *message*" just

received, thus satisfying the Historical Data Limitation.  *See* A6430-32

(emphasis added).  Similarly, AMS cited a new portion of the

specification in support of an argument that "the existence of a category

of TAC readings as distinct from other data supports [AMS's]

contention that when the AMS system makes a determination that an

alcohol event exists—from a TAC reading message—this is an 'action to

be applied'" to a message.  *See* A0010.

Effectively, those arguments were new claim construction

arguments regarding the word "message," with AMS asserting for the

first time that "message" as used in the Historical Data Limitation does

not mean the "alert messages" referred to in the specification.  The

district court found both arguments unpersuasive given that BI

explicitly argued on summary judgment that "BI does not literally

infringe the '611 Patent because the BI TAD system never queries

'historical data' in determining *what action to apply to the messages*,"

and AMS did not oppose that assertion.  A0009 (emphasis in original).
Because the issue was squarely presented on summary judgment and
AMS nevertheless failed to make the arguments described in its Rule
59(e) motion, the court found them waived and did not consider them.[4]
A0009-10.

Next, the district court refused to alter its order regarding the use
of the word "parse," explaining that the court's use was no different
than the way AMS used the word in its summary judgment response.
A0012.

Finally, the court rejected all of AMS's remaining arguments,
finding them waived due to AMS's failure to make them in its summary
judgment briefing even though it could have done so.  Specifically, the
court deemed waived AMS's arguments that:  (1) claim 7 of the '611
Patent does not require the "situation analyzer" to determine the
"action to be applied" to a message even though claim 1 does; (2) BI
infringed the '611 Patent under the doctrine of equivalents; and (3) BI
infringed based on the sequence of alerts when there is a TAC increase.

---

[4] The court also cited additional examples of BI raising the issue in a
manner "clear enough on summary judgment to put AMS on notice such
that it should have raised any counterarguments at that stage of the
proceeding."  *See* A0011-12.

A0012-13.  The court also held that it had already rejected in its summary judgment order AMS's argument that BI's MAD6 algorithm relies on historical data, noting that Rule 59(e) "may not be used to relitigate old matters."  A0013 (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008)).

**The '149 Patent**.  The district court held that AMS waived all its Rule 59 arguments with respect to the '149 Patent.  First, the court found that its 18-month old *Markman* order gave AMS "ample opportunity" to argue on summary judgment that the court's construction of "said first schedule" excludes the preferred embodiment and renders dependent claim 14 broader than independent claim 1—an argument AMS raised for the first time in its Rule 59 motion.  A0014-15.  Second, the court rejected AMS's attempt to raise new arguments that a "schedule" may refer to a computer program and that the court misinterpreted the term "predetermined time intervals."[5]  A0015-16.  As the court pointed out, AMS based both arguments on evidence that it failed to previously submit to the court, but which was not "new."  *Id*.

---

[5] AMS's "predetermined time intervals" argument—based on a new expert declaration—was that a reasonable juror could conclude that one skilled in the art would understand that computer programs execute instructions based on clocks, which dictate time intervals on which a loop will run.  *See* A6424-25.

Lastly, the court rejected two additional new arguments that AMS could have made on summary judgment:  (1) that the time intervals for each communication between the HomeBase modem and Host do not vary and are thus "predetermined," even if establishing different links between the modem and Host involves a variable time component; and (2) that BI's TAD system has a periodic callback option that satisfies the '149 Patent's Second Schedule Element.  A0016.

## SUMMARY OF THE ARGUMENT

The district court correctly granted summary judgment of non-infringement of the '149 Patent and the '611 Patent.  This Court should affirm in all respects.

As a threshold issue, AMS waived many of the substantive arguments it advances on appeal.  After losing on summary judgment, AMS filed a Rule 59(e) motion raising new arguments it failed to make in its earlier briefing.  Because Rule 59(e) does not permit a party to raise new arguments or expand the issues for appeal, the district court correctly found those arguments waived.

In its opening brief in this appeal, AMS challenged only one of the district court's ten waiver findings:  that AMS waived its argument that claim 7 of the '611 Patent is broader than claim 1 and covers any

24

component—not necessarily a "situation analyzer"—that uses historical data to determine the action to be applied to the incoming message. The district court, however, did not abuse its discretion by finding that new argument waived.

The record strongly supports the court's finding that AMS could have made the argument in its summary judgment briefing. In particular, BI's summary judgment argument explicitly addressed whether any aspect of the TAD system queries historical data, and also squarely addressed the difference between the TAD Processor and the AutoAlertHandler, two distinct processors that handle different functions. BI argued that while the TAD Processor may be considered a "situation analyzer" because it parses the incoming TAC data into messages, it does not decide the action to be applied to the message; and while the AutoAlertHandler decides the action to be applied to the messages, it is not a "situation analyzer." Those arguments—along with BI's argument that it was entitled to summary judgment of non-infringement on *all* claims of the '611 Patent—plainly put AMS on notice that the distinction between the TAD Processor and the AutoAlertHandler could be dispositive. Thus, the district court was well-within its discretion to find that AMS waived its new argument

about claim 7. Accordingly, this Court should not consider that argument when reviewing the district court's non-infringement findings.

AMS did not argue in its opening brief that the district court erred by finding that AMS waived the other nine arguments it raised for the first time in its Rule 59(e) motion. Accordingly, the district court's remaining waiver findings stand unchallenged and AMS has waived those arguments for a second time. As such, AMS cannot simply assert its nine substantive arguments as if the court never issued its Rule 59 order, which is the approach AMS took in its opening brief. Because the district court found those arguments waived and AMS did not challenge the district court's findings on appeal, this Court should refuse to consider them as well.

Turning to the summary judgment order, this Court should affirm the district court's finding of non-infringement of the '149 Patent, and can do so on either of two independent grounds. *First*, viewing the facts in the light most favorable to AMS, the BI TAD system does not meet the '149 Patent's First Schedule Limitation, which requires that the monitor device take "a plurality of transdermal alcohol concentration readings at predetermined time intervals according to a first schedule

stored in a first memory" within the device, and then communicate the TAC readings to a modem "at predetermined time intervals *according to said first schedule*." Not only do the claim language, specification, and prosecution history all support construing "said first schedule" to mean "same first schedule," this Court's precedent suggests that AMS's construction—under which "said first schedule" means *any* schedule—is objectively unreasonable. Because AMS conceded that the BI TAD system does not take TAC readings on the same schedule by which it transmits the readings to the HomeBase modem, there is no material dispute as to the relevant facts. Applying the properly construed claim to the accused product, the district court correctly concluded that the BI TAD system does not meet the Patent's First Schedule Limitation and thus does not infringe the '149 Patent as a matter of law.

*Second*, the district court also correctly concluded that the BI TAD system does not meet the '149 Patent's Second Schedule Limitation, which requires that the TAC readings transmitted from the device to the modem be stored "in a second memory in said modem" and then communicated "from said modem to said monitor network at *predetermined time intervals according to a second schedule* stored in said second memory" within the modem. It is undisputed that the

HomeBase modem transmits TAC data to the BI Host immediately upon receiving it from the TAD device—there is no predetermined time interval or schedule stored in the modem's memory that governs the transmission. The district court properly rejected AMS's argument that the transmission occurs at a "predetermined time interval" merely because the modem's processor necessarily takes an indeterminate and varying amount of time to make the transmission. As a result, the court correctly held that BI is alternatively entitled to summary judgment of non-infringement of the '149 Patent because the BI TAD system does not meet the Second Schedule Limitation.

Finally, this Court should affirm the district court's finding of non-infringement of the '611 Patent. As the district court found, the BI TAD system does not meet the Historical Data Limitation, which requires that a "situation analyzer" query workflow instructions and historical data related to *past* messages to determine the action to apply to the incoming *current* message. It is undisputed that neither of the two relevant processors in the BI TAD system—the TAD Processor and the AutoAlertHandler—query historical data. Moreover, it is undisputed that the TAD Processor does not determine the action to apply to a message and that the AutoAlertHandler cannot be considered a

"situation analyzer." Thus, there is nothing in the BI TAD system that satisfies the Historical Data Limitation.

AMS's argument that the TAD Processor queries historical data by using the *current* stream of TAC data to determine whether the TAC averages warrant a violation message is contrary to the parties' stipulated claim construction of "historical data." At the *Markman* hearing, AMS disavowed any construction that treats the current stream of TAC data as "historical data" and later stipulated to a construction under which historical data means "data relating to prior messages, as opposed to data relating to the message just received by the situation analyzer." AMS's other arguments are equally lacking— they are based on a new construction of the word "message" that AMS waived in two separate ways.

Applying the properly construed claim to the accused product, the district court's non-infringement finding was correct. Even viewing the facts in the light most favorable to AMS, the BI TAD system does not meet the Historical Data Limitation and thus, as a matter of law, does not infringe the '611 Patent.

# ARGUMENT

## I. Standard of Review

In addition to the standards of review AMS recited in its opening brief, this Court reviews a district court's denial of a Rule 59(e) motion under regional circuit law. *See, e.g.*, *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1192 (Fed. Cir. 2014). The Tenth Circuit reviews the denial of a Rule 59(e) motion for an abuse of discretion. *Butler v. Kempthorne*, 532 F.3d 1108, 1110 (10th Cir. 2008). The court "will not disturb such a decision 'unless [it has] a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Barber v. Colo. Dep't of Rev.*, 562 F.3d 1222, 1228 (10th Cir. 2009) (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997)).

## II. AMS Waived Any Challenge to Nearly All the District Court's Rule 59(e) Rulings

As a threshold issue, many of AMS's substantive arguments are procedurally barred. This case involves two layers of waiver. AMS's first waiver occurred when it failed to advance numerous arguments in its summary judgment briefing, instead raising them for the first time in its Rule 59(e) motion. In doing so, AMS ran afoul of black letter law holding that a Rule 59(e) motion "may not be used to relitigate old

30

matters, or to raise arguments or present evidence that could have been

raised prior to the entry of judgment." *Exxon*, 554 U.S. at 486 n.5

(quoting reference omitted); *see also Grynberg v. Total S.A.*, 538 F.3d

1336, 1354 (10th Cir. 2008). Because nearly all of AMS's Rule 59

arguments were simply belated summary judgment or claim

construction arguments that AMS failed to raise earlier, the court found

them waived and refused to consider them. A0003-17. Specifically, in

its Rule 59 Order, the court found the following ten arguments waived:

> 1.    That the BI TAD system literally infringes the '611 Patent because it contains a situation analyzer that "assembles sufficient TAC data messages to determine if elevated TAC readings indicate a drinking event or a false positive," which constitutes "an action applied to the message received" and thus satisfies the Historical Data Limitation, *see* A0009;

> 2.    That "the existence of a category of TAC readings as distinct from other data" supports AMS's argument that when a "system makes a determination that an alcohol event exists—from a TAC reading message—this is an "action to be applied" to the message, and thus satisfies the Historical Data Limitation, *see* A0010;

> 3.    That claim 7 of the '611 Patent untethered the "action to be applied" limitation from the situation analyzer, *see* A0012-13;

> 4.    That BI infringed the '611 Patent based on the sequence of alerts when there is a TAC increase, *see* A0013;

> 5.    That BI infringed the '611 Patent based on the doctrine of equivalents, A0012-13;

31

6.    That the district court's construction of "said first schedule" as that term is used in the '149 Patent's First Schedule Limitation excludes the preferred embodiment and renders dependent claim 14 broader than independent claim 1, *see* A0014-15;

7.    That with respect to the '149 Patent's Second Schedule Limitation, "schedule" may refer to a computer program, *see* A0015;

8.    That with respect to the '149 Patent's Second Schedule Limitation, "predetermined time intervals" may refer to computer programs executing instructions based on clocks, which dictate time intervals on which a loop will run, *see* A0015-16;

9.    That the time intervals for each communication between the HomeBase modem and Host do not vary and are thus "predetermined," even if establishing different links between the modem and Host involves a variable time component, *see* A0016; and

10.    That BI's TAD system has a periodic callback option that satisfies the '149 Patent's Second Schedule Element, *see* A0016.

In order to overcome the first level of waiver on those ten arguments, AMS has to successfully challenge the district court's Rule 59(e) ruling.  *See Steele v. Young*, 11 F.3d 1518, 1520 n.1 (10th Cir. 1993) (Rule 59 may not be used to expand the issues properly preserved for appeal).  That is, it cannot simply advance the arguments on appeal as if the district court never ruled on them; it must first convince this Court that the district court abused its discretion by finding them waived.  *Butler*, 532 F.3d at 1110.  If the district court's first-level

waiver findings did not constitute an abuse of discretion, AMS cannot resurrect the substantive arguments on appeal. *See Steele*, 11 F.3d at 1520 n.1.

AMS, however, has committed a second level of waiver that forecloses its ability to challenge nearly all the district court's waiver findings. In this appeal, AMS challenged the court's Rule 59 order as to only one of its ten arguments. Without citing the appropriate standard of review or expressly arguing that the court abused its discretion, AMS criticized the court's refusal to consider in its Rule 59(e) order AMS's new argument that claim 7 of the '611 Patent untethered the "action to be applied" limitation from the situation analyzer. *See* Opening Br., at 52-54. Thus, AMS's opening brief at least arguably challenged the court's first-level waiver finding as to that one argument.[6]

With respect to the other nine arguments, however, AMS waived its challenge to the district court's Rule 59 order—and thus to the court's first-level waiver findings—by failing to argue the issue in its

_____

[6] To reiterate, by preserving a challenge to the district court's waiver finding, AMS did not automatically preserve the right to assert on appeal its substantive argument about claim 7 of the '611 Patent. AMS would be entitled to do so only if the court abused its discretion by finding that argument waived. As discussed below, the court's waiver finding was correct, and certainly was not an abuse of discretion. *See infra*, at 61-64.

opening brief.  At best, AMS made passing, conclusory statements asserting that it could not have raised several of its substantive arguments prior to the entry of judgment.  *See* Opening Br., at 35-36, 44, 52 n.13.  But AMS did not develop any argument that the district court abused its discretion by finding those particular arguments waived.  Instead, AMS simply advanced those same arguments on appeal as if the district court's Rule 59 order did not exist.  That approach, however, is impermissible.

Appellate courts "[are] entitled to assume that an appellant has raised all issues it deems important against a judgment appealed from." *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999).  "An issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived." *Id*.  Likewise, "[i]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (internal quotation marks omitted) (quoted favorably in *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006)).

The district court's Rule 59 ruling that AMS waived its new arguments is undoubtedly within the scope of the appealed judgment. Indeed, AMS filed an amended notice of appeal to encompass that ruling. *See* Opening Br., at 2; *see also* Fed. R. App. P. 4(a)(4)(B)(ii). Thus, by failing in its opening brief to make or develop any argument that the district court abused its discretion in finding those new arguments waived, AMS committed a second waiver—waiving its right on appeal to contest nine of the district court's ten Rule 59 waiver findings. *See SmithKline Beecham*, 439 F.3d at 1319 ("Our law is well established that arguments not raised in the opening brief are waived.").

As a result, the district court's first-level finding that AMS waived nine of its substantive arguments stands unchallenged and AMS cannot raise those arguments on appeal. BI thus responds to only those arguments AMS preserved by sufficiently and timely raising them below and in this appeal.

## III. The District Court Correctly Granted Summary Judgment of Non-Infringement of the '149 Patent

Under the "all elements" rule, "[t]o prove infringement, a patentee must show that an accused product embodies all limitations of the claim either literally or by the doctrine of equivalents." *Cephalon, Inc. v.*

35

*Watson Pharm., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013).  The infringement analysis involves two steps:  claim construction and applying the properly construed claim to the accused product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

With respect to the '149 Patent, AMS challenges both steps of the district court's analysis.  But AMS is wrong on both counts.  The court properly construed the relevant claim terms and found that, even viewing the facts in the light most favorable to AMS, the BI TAD system lacks two limitations of the '149 Patent's independent claims: the First Schedule and Second Schedule Limitations.  Both findings are correct and either is sufficient to affirm the court's holding that BI was entitled to summary judgment of non-infringement.

## A.    The BI TAD System Does Not Satisfy the First Schedule Limitation

AMS concedes that the BI TAD system does not communicate TAC readings to the HomeBase modem according to the same schedule on which it takes those readings from the subject.  *See* Opening Br., at 28.  Instead, it argues only that the district court misconstrued the First Schedule Limitation, which requires that the monitor device take "a plurality of transdermal alcohol concentration readings at

predetermined time intervals according to a first schedule stored in a first memory" within the device, and then communicate the TAC readings to a modem "at predetermined time intervals according to said first schedule."  A0108 (16:52-65), A0110 (19:22-32).  The only question with respect to the '149 Patent's First Schedule Limitation is thus whether the district court correctly held that the limitation requires the device to communicate TAC readings according to the same "first schedule" on which it takes them.  The claim language's plain and ordinary meaning confirms that the court's interpretation was correct.

### 1.  The District Court Consistently Interpreted "Said First Schedule"

Contrary to AMS's assertion, the district court did not "change[ ] its mind" in its summary judgment order with respect to the meaning of "said first schedule."  *See* Opening Br., at 22.  In its *Markman* order, the court rejected AMS's argument that the First Schedule Limitation can be construed to encompass discrete and differing sub-schedules for taking and communicating TAC readings.  A0057-58.  The court also rejected BI's proposed construction, but only because the court believed that no specific construction was necessary given that "'said first schedule' and 'same first schedule'" mean the same thing."  A0058.  In its summary judgment order, the court both recounted its *Markman*

reasoning and adhered to it.  A0026-27.  Simply put, there is no disconnect between the *Markman* and summary judgment orders on the meaning of "said first schedule."

### 2. The District Court's Interpretation of "Said First Schedule" Was Correct

AMS is also wrong that interpreting "said first schedule" and "same first schedule" to mean the same thing renders the First Schedule Limitation superfluous.  As it did below, AMS quotes from the specification and then concludes that the specification "makes clear" that the First Schedule Limitation contemplates separate schedules for taking and transmitting TAC readings, without ever explaining *why*.  *See* Opening Br., at 23-24.  In reality, the claim language, specification, and prosecution history all support the district court's holding.

### a. The Claim Language Supports the District Court's Holding

The scope of a patentee's invention is defined by the "plain import" of its claims.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting reference omitted).  Claim terms "are generally given their ordinary and customary meaning," which is the meaning they would have to a person of ordinary skill in the art at the time of the invention.  *Id*. at 1312-13 (quoting references omitted).  As is the

case here, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of widely accepted meaning of commonly understood words." *Id.* at 1314.

There is nothing ambiguous about the plain language of the First Schedule Limitation. Claim 1 of the '149 Patent very clearly requires the taking of TAC readings to occur "according to a first schedule" and the transmission of TAC readings to the modem to occur "according to said first schedule." A0108. "Said" is a commonly understood word that, when used in that context, means "[n]amed or mentioned before; aforementioned." The American Heritage Dictionary 1143 (New College ed. 1979); *see also Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."). The first and only place the term "first schedule" appears in Claim 1 before "said first schedule" is in the preceding element describing TAC readings. A0108. Thus, based on the claim language itself, there can be no credible dispute that the "said first schedule" on which the device must transmit TAC readings to the modem is the *same* first schedule on which it must take the readings from the subject.

On that point, *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361(Fed. Cir. 2012) is telling.  In *Raylon*, the patentee argued that limitations describing "a printer assembly being mounted in said interior of said housing" and "said housing having an elongated slot for selectively receiving the identification card" covered "printer assemblies and elongated slots that were contained in *any* housing despite the use of 'said' housing in the claims."  *Id*. at 1369 n.5 (emphasis added).  The court found that argument so objectively unreasonable that it constituted a Rule 11 violation in light of the facts.  *Id*. at 1369-70.  Although BI is not contending that AMS violated Rule 11, the point stands:  construing "said first schedule" to mean *any* schedule is objectively unreasonable.[7]

---

[7] Further supporting the district court's interpretation is claim 1's later identification of a "second schedule."  Given that the claim distinguishes between time intervals according to a first schedule and time intervals according to a second schedule, it would not make sense to construe "first schedule" as allowing for differing time intervals all under the auspices of a single schedule.  If that were the case, the "second schedule," would really be the third schedule, the fourth schedule, or some other number.  *See* A0058.   Under AMS's theory, the second schedule could also be referred to as "said first schedule," since AMS's position would allow for different actions to be taken at different time intervals, yet still be considered to adhere to one "schedule."  AMS's interpretation renders the claim terms "first," "second," and "schedule" meaningless.

### b.    The Specification Supports the District Court's Holding

The claim language, of course, does not stand alone. *Phillips*, 415 F.3d at 1315. It must be read in light of the specification, which "is always highly relevant to the claim construction analysis." *Id.* (quoting reference omitted). "Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* That said, "claims may be no broader than the supporting disclosure, and therefore . . . a narrow disclosure will limit claim breadth." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998).

Here, nothing in the specification reveals that AMS gave "said first schedule" a meaning different from that it would otherwise possess. *See Phillips*, 415 F.3d at 1316 (the inventor's lexicography governs). The specification simply does not say what AMS wishes it said. For example, AMS quotes the following specification language in support of its proposed construction: "TAC readings are taken as scheduled without the participation of Subject 102, with the data uploaded at scheduled time intervals to Modem 104." *See* Opening Br., at 23 (quoting A0102). But nothing in that language states that the scheduled time intervals on which the data is uploaded to the modem must be *different* than the schedule on which the device takes TAC

readings.  Likewise, that the specification references "monitoring schedules" and "reporting schedules" does not mean that the schedules are necessarily different.  *See id.* at 24 (quoting A0102, A0106).  At base, there is no passage in the specification conveying that the claim's unambiguous use of "said first schedule" for communicating TAC readings refers to something other than the previously mentioned "first schedule" for taking TAC readings.  *See Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (this Court's "settled practice" is to "construe the claim as written, not as the patentee[ ] wishes [it] had written it").

### c.    The Prosecution History Supports the District Court's Holding

AMS also ignores that it added the First Schedule Limitation during prosecution to avoid a rejection based on prior art.  *See Phillips*, 415 F.3d at 1317 (prosecution history is relevant to claim construction).  While the inventors may have originally contemplated a broader scope of invention in the specification and original claims—one that encompassed the taking and transmission of TAC readings on different schedules or no schedule at all—they were not entitled to such a scope in view of the prior art.  A5942-65; *see also N. Am. Container v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005) ("[T]fact

that claims do not cover certain embodiments disclosed in the patent is compelled when narrowing amendments are made in order to gain allowance over prior art."); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000) ("[T]he unambiguous language of the amended claim controls over contradictory language in the written description."). During prosecution, AMS was forced to narrow the claims accordingly, restricting the taking of TAC readings to a "first schedule" and restricting the transmission of TAC readings to that same "first schedule." A6014-20. Having done so, AMS cannot now rely on a purported broader description than that set forth in the plain language of the amended claim. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (quoting reference and internal quotation marks omitted).

* * *

In sum, the claim language, the specification and the prosecution history all support the district court's holding. All three demonstrate that the First Schedule Limitation requires that the "said first schedule" on which the device transmits TAC readings to the modem is

43

the same "first schedule" on which the device takes the readings. Any other construction is objectively unreasonable.[8]  *See Raylon*, 700 F.3d at 1369-70.

### 3. Because the District Court's Interpretation of "Said First Schedule" Was Correct, Its Grant of Summary Judgment Was Also Correct

Applying the properly construed claim to the accused product, *see Markman*, 52 F.3d at 976, is straightforward here. Given AMS's concession that the BI TAD system does not take TAC readings on the same schedule by which it transmits the readings to the HomeBase modem, *see* Opening Br., at 28, there is no material dispute as to the relevant facts. And because those facts establish that the BI TAD system does not meet the First Schedule Limitation, the district court correctly held that, as a matter of law, BI was entitled to judgment of non-infringement of the '149 Patent.[9]  *See Cephalon, Inc.*, 707 F.3d at

---

[8] As discussed above, AMS "necessarily waived" its additional claim construction arguments—specifically, its preferred embodiment and claim differentiation arguments—because the district court found those arguments waived below and AMS did not challenge that first-level waiver finding on appeal. *See supra*, at 30-35; *Engel Indus.*, 166 F.3d at 1383; *SmithKline Beecham*, 439 F.3d at 1319-20.

[9] In its opening brief, AMS did not argue that the TAD system infringed the First Schedule Limitation under the doctrine of equivalents. *See* Opening Br., at 22-28.

1340.  This Court should affirm the district court's summary judgment ruling on the '149 Patent for that reason alone.

## B.    The BI TAD System Does Not Satisfy the Second Schedule  Limitation

The Court should also affirm because the BI TAD system does not meet the '149 Patent's Second Schedule Limitation, which requires that that TAC readings transmitted from the device to the modem be stored "in a second memory in said modem" and then communicated "from said modem to said monitor network at *predetermined time intervals according to a second schedule* stored in said second memory" within the modem.  A0109 (emphasis added).  The parties appear to agree that the district court correctly concluded that the Second Schedule Limitation required no construction.  *See* Opening Br., at 28-29.  But AMS is wrong that (1) the court inappropriately resolved genuine issues of material fact, and (2) BI failed to argue the "predetermined time interval" element of the Second Schedule Limitation.

### 1.    There Are No Genuine Fact Issues

Much of AMS's effort to create a fact issue relies on arguments it waived by failing to challenge the district court's Rule 59 order.  *See, e.g.*, Opening Br., at 31.  Waived arguments aside, AMS's latest theory is that in order for the HomeBase modem to transmit TAC data

45

immediately upon receipt, it runs software on a loop to check for TAC

readings received from the TAD device, and then immediately

transmits to the Host any readings it identifies. *See id.* at 28-31. Based

on that theory, AMS argues that there is a factual dispute about

whether the HomeBase modem transmits TAC readings to the Host "at

predetermined time intervals according to a second schedule."

The problem with AMS's theory is that it violates the words

"predetermined" and "schedule." In his deposition, AMS's expert

testified that the time interval on which the HomeBase transmits TAC

readings to the Host begins when the HomeBase receives the TAC data.

A6092 (63:13-19) ("This time interval does not start until after you get

the data."). The expert then admitted that the interval will involve

"some variance." A6092-93 (63:20-65:12). Similarly, AMS admitted in

its brief that the "duration of the predetermined time interval" on which

the HomeBase transmits TAC data to the Host will be "differen[t]" each

time a transmission occurs depending on when the loop runs. *See*

Opening Br., at 31-32.

In short, while the circuitry in the HomeBase modem necessarily

requires some amount of time to actually initiate and make the

transmission after it receives TAC data from the TAD device, that

amount of time is not predetermined and is not on any schedule.

Notably, AMS's expert was unable to specify *any* predetermined time

interval that governed the transmission of the TAC data, instead simply

stating that the time interval was "however long it takes." *See* A6092-

93 (64:24-65:12). The Second Schedule Limitation, however, requires

that the time interval be *according to a schedule* and be *predetermined*,

*i.e.*, determined in advance. AMS's expert's inability to identify any

actual predetermined time interval confirms AMS's failure to satisfy

this claim element.

If the time between the HomeBase's receipt of TAC data from the

TAD device and its subsequent transmission of that data to the Host is

sometimes a nanosecond, sometimes a hundredth of a second, and other

times a full second, and none of those varying intervals are

programmed or determined beforehand, then it is not communicating

the readings at predetermined time intervals according to a schedule.

To the contrary, "however long it takes"—which is what AMS's own

expert testified—equates to no schedule and no predetermined time

interval at all. *See* A6092-93 (64:24-65:12).

The district court's bus analogy, *see* A0032, is apt, but the

difference between traditional television programming and on-demand

47

programming may be even better. Traditional television programming operates "at predetermined time intervals according to a schedule." A particular program comes on according to the schedule—usually at the top or bottom of the hour—followed by another at a predetermined time interval—most often 30 or 60 minutes later. With on-demand programming, on the other hand, the particular program does not come on according to a schedule; it comes on whenever the viewer chooses to start it. And the time intervals at which programs are broadcast are not predetermined; they are highly variable and event-based—the event being the viewer's choice about when to start the next program. Thus, on-demand programming can hardly be said to operate "at predetermined time intervals according to a schedule."

The same is true here. If the time intervals on which the HomeBase transmits TAC readings to the Host are not determined in advance and simply vary from transmission-to-transmission by an unknown amount because of "hardware and systems and communication"—which is what AMS's expert testified, A6092 (63:20-64:10)—those intervals are not "predetermined according to a schedule." *Cf. Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1333-34 (Fed. Cir. 2005) (where a claim limitation specified a "time interval of

predetermined duration," the appellant "attache[d] no significance to the word 'predetermine' when it argued "that the 'time interval' can vary after the determination is made"). Thus, even under AMS's version of the facts, the BI TAD system does not meet the Second Schedule Limitation.

### 2. BI Argued the "Predetermined Time Interval" Element Below

AMS alternatively contends that the district court erred by "*sua sponte*" holding that the BI TAD system does not satisfy the Second Schedule Limitation because BI argued only that the HomeBase modem does not transmit data to the Host according to a second schedule, but failed to argue that the transmissions do not occur at predetermined time intervals. *See* Opening Br., at 34-35. Thus, AMS contends that it "did not understand" that the predetermined time interval limitation was at issue until the court issued its summary judgment order. AMS asserts that had it understood that the limitation was at issue, it could have argued infringement under the doctrine of equivalents. *Id.* at 35-36. That argument is meritless.

In BI's opening summary judgment brief, it italicized the phrase "*predetermined time intervals*" when reciting the Second Schedule Limitation. A5550. It then recounted the district court's *Markman*

ruling, stating that regardless whether the modem transmits data immediately to the Host, "it must also at some point transmit data on predetermined time intervals according to a schedule." *Id.* BI went on to argue both that "there is no schedule of any kind stored in the HomeBase," and that "the HomeBase modem never transmits TAC readings to the Host *according to predetermined time intervals*." A5550-51 (emphasis added).

AMS's contention that it did not understand that the limitation was at issue is belied by the fact that AMS contested BI's argument in its response brief. AMS did not, for example, argue only that the HomeBase modem communicates TAC readings to the Host according to a schedule with no mention of predetermined time intervals. In at least three places in its brief, AMS argued that "the HomeBase communicates readings to the Central Monitor Network [Host] *at predetermined time intervals* according to a second schedule." A6298 (emphasis added); *see also* A6299 ("This communication thus necessarily occurs *at predetermined time intervals* according to a second schedule that is triggered when data is stored on the HomeBase.") (emphasis added); A6299 ("Thus, the BI TAD system also identifies the absence of communication *at predetermined time intervals* according to

50

the second schedule in order to confirm the equipment is functioning properly.") (emphasis added).

Equally lacking is AMS's contention that it "could have" argued that the TAD system infringed the Second Schedule Limitation under the doctrine of equivalents had it understood that the predetermined time interval limitation was at issue. AMS did, in fact, argue infringement under the doctrine of equivalents. From pages fourteen to sixteen of its summary judgment response brief, AMS argued that prosecution history estoppel did not apply to either the First Schedule or Second Schedule Limitation. A6300-02. AMS then specifically argued that "BI . . . infringes the Second Schedule [Limitation] under the doctrine of equivalents," devoting a paragraph to the issue. A6303.

Simply put, BI squarely raised and argued the predetermined time interval element of the Second Schedule Limitation on summary judgment and AMS substantively responded, including with a doctrine of equivalents argument. AMS has no justifiable basis for contending that it did not understand that the predetermined time interval limitation was at issue or that it did not get to raise its doctrine of

51

equivalents argument as a result.[10]  The record is directly contrary to AMS's argument and this Court should summarily reject it.

* * *

The district court appropriately concluded that there is no genuine issue of fact about the Second Schedule Limitation.  The HomeBase modem transmits TAC readings to the Host immediately on receipt, at intervals that are not predetermined and which AMS's own expert admitted vary from transmission-to-transmission.  A5925-26; A6092-93 (62:21-65:12).  As such, it does not meet the Second Schedule Limitation's requirement that such transmissions occur "at predetermined time intervals according to a second schedule."  A0109.  Thus, the district court correctly entered summary judgment of non-infringement of the '149 Patent in BI's favor for that reason as well.

---

[10] On appeal, AMS's argument that prosecution history estoppel does not apply to the Second Schedule Limitation consists of a single conclusory sentence citing a single page of the record, which merely recites the amended claim language but says nothing about the *reason* for amendment.  *See* Opening Br., at 36 (citing A2414).  Passing, conclusory references to an issue, however, do not preserve it for appellate review.  *See SmithKline Beecham*, 439 F.3d at 1320 (citing cases).  Thus, AMS waived its doctrine of equivalents argument.

52

## IV. The District Court Correctly Granted Summary Judgment of Non-Infringement of the '611 Patent

AMS contests the district court's summary judgment ruling that BI's TAD system does not infringe the '611 Patent on three grounds:  (1) genuine issues of material fact exist about whether BI's TAD processor's MAD6 algorithm meets the Historical Data Limitation; (2) the court misconstrued the claim term "message;" and (3) the court erred by reading limitations from claim 1 into independent claim 7.  *See* Opening Br., at 43-54.  While all three arguments are wrong on the merits, only the MAD6 argument is preserved on appeal.

### A. Construction of the Historical Data Limitation

Before delving into AMS's specific arguments, some context about the construction of the Historical Data Limitation is appropriate.  Claim 1 of the '611 Patent first requires that a "situation analyzer parses raw data through a predetermined set of rules into a plurality of messages." A5615-16.  The Historical Data Limitation additionally requires that the situation analyzer query workflow instructions and "a historical data relating to similar said plurality of messages for an action to be applied to each of said plurality of messages."  *Id.*

At the *Markman* hearing, the district court considered whether the stream of TAC data leading up to the determination of an alert

message could be considered "historical data." A5344-47. BI's position was that "historical data" included only data related to past messages, not data related to creation of the *instant* message. A5344-46. AMS agreed and took the following position:

> *Mr. Martin*: If that's the dispute, there is no dispute. Historical data means historical data.
>
> *The Court*: What does historical data mean?
>
> *Mr. Martin*: Historical data means the historical raw data that is related to prior messages.
>
> *The Court*: Not the instant message.
>
> *Mr. Martin*: Right, not the instant message, of course not.

A5347.

Consistent with their agreement at the *Markman* hearing, the parties later stipulated to construe "historical data" to mean "data relating to prior messages, as opposed to data relating to the message just received by the situation analyzer." A0065. The district court accepted that stipulated construction. *Id*.

## B. Applying the Properly Construed Claim, BI's TAD System Indisputably Does Not Meet the Historical Data Limitation

As it did below, AMS ignores both the parties' agreed construction of "historical data" and the "action to be applied" aspect of the Historical

Data Limitation.  Under the appropriate analysis, in order to infringe the '611 Patent, "the BI system would have to possess a situation analyzer that would use historical data relating to prior messages in deciding what action to apply to the incoming message just received." *See* A0036.  Even viewing the facts in the light most favorable to AMS, BI's TAD system does not meet that limitation.

BI conceded that the TAD Processor may be deemed a "situation analyzer" for purposes of satisfying the earlier element of the claim—it parses an incoming stream of TAC data into alcohol events (a "plurality of messages").  *See* A5552; A5931.  The TAD Processor does not, however, play any role in determining what action to apply to the message.  Instead, that function is relegated to the AutoAlertHandler, an entirely separate processor that determines the actions to apply to all messages, whether they be alcohol, curfew, tamper, etc.  A5931.  Thus, regardless whether the TAD Processor queries historical data, the fact that the TAD Processor plays no role in determining the action to be applied to the messages means that the TAD Processor fails to satisfy the claim limitation.

Additionally, even though the AutoAlertHandler determines the actions to apply to the messages, it cannot be deemed a situation

55

analyzer because it does not parse raw data into a plurality of messages. *See* A5931-32; *see also* A5837. Thus, the AutoAlertHandler does not meet the Historical Data Limitation either.

Finally, the TAD system does not meet the Historical Data Limitation because, regardless which component is designated the "situation analyzer," neither the TAD Processor nor the AutoAlertHandler ever query or rely on historical data in performing their respective functions. To determine whether TAC data warrants a violation message, the TAD Processor looks at only the *current* stream of five-minute TAC averages, A5931—data that AMS conceded at the *Markman* hearing does not constitute "historical data" because it is related to the instant message, not some past message, A5347. Likewise, the AutoAlertHandler does not query historical data (*i.e.*, data relating to prior messages) in determining the action to apply to the messages. A5932. When a new violation message is placed in the event table, the AutoAlertHandler simply queries the customer's pre-selected preferences and assigns an action to the message in accordance with those preferences. *Id*. Thus, neither prior messages nor data relating to prior messages plays any role in either the TAD Processor's or the AutoAlertHander's respective functions. *Id*.

AMS's MAD6 argument does not change that result or create a fact issue that precludes summary judgment.  Fundamentally, AMS premises its argument on a claim construction it disavowed—that by using the *current* stream of TAC data to determine whether the TAC averages warrant a violation message, the TAD Processor is querying historical data.  *See, e.g.*, Opening Br., at 39-43.  But that is not "historical data" under the parties' stipulated construction and there is no other record evidence that the MAD6 algorithm considers data relating to *past* messages (because it does not).

That aside, there is also no record evidence that MAD6 plays any role in determining the action applied to each message (again, because it does not).  Because the '611 Patent requires that historical data be queried in determining the action to be applied to each message, the TAD Processor's inability to perform that task takes it outside the patent's scope.

## C.    AMS Waived Its New Arguments About Construction of the Word "Message"

To avoid both the fatal flaws in its MAD6 argument and the stipulated construction of "historical data," AMS conjured a new meaning for the word "message" in its Rule 59 brief and now presses that meaning on appeal.  AMS's theory is that the current incoming

stream of TAC averages—not the violation messages—are actually the "messages." *See* Opening Br., at 37-50. That theory allows AMS to then argue that MAD6 consults historical data because it looks to the current stream of five-minute TAC averages, which AMS characterizes as *past* messages. *Id.* From there, AMS argues that the TAD Processor's decision about whether the TAC data warrants a violation message—not the AutoAlertHandler's decision about what to do with the violation message—is actually the "action to be applied" to the message. *Id.*

Among other problems with that argument, AMS waived it in two separate ways. First, it conceded at the *Markman* hearing that the stream of TAC data leading up to an alert message is not "historical data." A5347. Given that concession, AMS cannot now transform the current stream of TAC data into "historical data" by labeling it "messages." *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1273 (Fed. Cir. 2012) ("[A] party may not introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below." (quoting *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006))).

Second, AMS failed to challenge the district court's Rule 59 ruling that AMS waived its new construction of "messages."  In its Rule 59 order, the court held that by failing to assert the following arguments on summary judgment—even though it had the opportunity to do so— AMS waived them:  (1) that the BI TAD contains a situation analyzer that "assembles sufficient TAC data messages to determine if elevated TAC readings indicate a drinking event or a false positive," which constitutes "an action applied to the message received" and thus satisfies the Historical Data Limitation; and (2) that "the existence of a category of TAC readings as distinct from other data" supports AMS's argument that when a "system makes a determination that an alcohol event exists—from a TAC reading message—this is an 'action to be applied'" to the message, and thus satisfies the Historical Data Limitation.  A0009-10.

Despite the district court's ruling that AMS waived those arguments below, they are precisely the arguments AMS now advances on appeal.  *See* Opening Br., at 37-50.  But as discussed above, apart from conclusorily asserting that it did not have the opportunity to make those arguments prior to entry of judgment, AMS did not challenge the district court's waiver findings.  *See supra*, at 33-35.  By failing to do so,

AMS thus waived any argument that the district court abused its discretion. *SmithKline Beecham*, 439 F.3d at 1319-20. And absent an abuse of discretion resulting in reversal of the district court's Rule 59 rulings, AMS cannot advance on appeal the same substantive arguments that the district court found waived. *See, e.g., Polk v. Soc. Sec. Admin., Comm'r*, 579 F. App'x 843, 846-47 (11th Cir. 2014).

From its new argument about "messages," AMS also argues in a footnote that BI's TAD system infringes the '611 Patent under the doctrine of equivalents. That is yet another argument on which the district court's waiver finding stands unchallenged, *see supra,* at 30-35, and arguments raised in footnotes of an opening brief are not preserved in any event. *SmithKline Beecham*, 439 F.3d at 1320.

In short, regardless whether AMS's new arguments are waived because of AMS's claim construction position below or its failure to challenge the district court's Rule 59 rulings, this Court cannot consider them—not standing alone, not bootstrapped into AMS's MAD6 argument, and not to resurrect a waived doctrine of equivalents argument.

### D.   The District Court Did Not Abuse Its Discretion by Finding that AMS Waived Its Argument that Claim 7 Untethered the Situation Analyzer from the Historical Data Limitation

After the district court correctly held that AMS presented no evidence that BI's TAD system includes a "situation analyzer" that queries historical data to determine what action to apply to a message, A0038, AMS shifted gears.  In its Rule 59 motion, AMS conceded that claim 1 requires that a situation analyzer determine the "action to be applied," but argued that claim 7 is broader and covers "any component, or group of components" that perform that step.  A6429-30.

The district court held that AMS waived that argument because it could have made it at the summary judgment stage but failed to do so. A0012-13.  On appeal, that is the sole waiver finding AMS challenged. *See* Opening Br., at 52-54.  Although AMS did not explicitly argue that the district court abused its discretion, *see Butler*, 532 F.3d at 1110, it argued that in contesting a summary judgment motion of non-infringement, it had no burden to prove that BI infringes on theories BI did not raise, and that BI's opening summary judgment brief did not put AMS on notice "that the separation of the TAD Processor from the AutoAlertHandler could be dispositive."  *See* Opening Br., at 53-54.

Thus, AMS asserts that the district court should have considered its claim 7 argument. *Id*.

Again, AMS is wrong. The district court's waiver finding does not even approach the kind of "clear error of judgment" necessary for an abuse of discretion, *see Barber*, 562 F.3d at 1228. In fact, the district court was entirely correct.

It simply is not believable that AMS did not understand that the difference between the TAD Processor and the AutoAlertHandler could be dispositive. BI based its summary judgment argument in large part on that very premise. Reciting the undisputed facts, BI included separate subheadings for the TAD Processor and the AutoAlertHandler. A5543-44. Discussing the TAD Processor, BI recited that, "[w]hile the TAD Processor determines whether TAC data warrants a violation message, the TAD Processor does not determine what action should be applied to the message or how it should be handled." A5543.

Discussing the AutoAlertHandler, BI recited that "[t]he AutoAlertHandler is a separate processor that retrieves the messages from the event table and determines what action to apply to each message, e.g., send a notification to the customer." A5544. BI then expressly argued that while the TAD Processor may be deemed a

"situation analyzer," it "does not decide what action to apply to the violation messages; this function is reserved for the AutoAlertHandler, a separate processor within the Host." A5552. Given those explicit arguments, AMS was plainly on notice that BI's non-infringement argument was based, in part, on the fact that the TAD Processor—the "situation analyzer" in the BI TAD system—did not determine what action to apply to the messages, and that function was performed by the AutoAlertHandler instead.[11]

AMS was also on notice that BI was moving for summary judgment of non-infringement of the entire '611 Patent, not merely claim 1. BI's motion made clear that BI contended that "*[a]ll claims* of the '611 Patent require that, after the 'situation analyzer' parses the data into alter messages, the situation analyzer then queries 'historical data' relating to *past messages* in determining an action to apply to each current message." A5537 (emphasis to "all claims" added). In support of that contention, BI cited an exhibit that included a recitation of both claim 1 and claim 7. *Id.* (citing A5614-16). In fact, AMS's response

---

[11] AMS neglected to make this argument at the summary judgment stage perhaps because it is immaterial. As discussed above, there is *no component* in the BI TAD system— not the TAD processor and not the AutoAlertHandler —that takes historical data into account, either separately or together. *See supra*, at 54-57.

even referenced the "asserted independent *claims* of the '611 Patent" in the plural, even though AMS quoted only claim 1.  A6304.

Simply put, the record strongly supports the district court's waiver finding.  In light of the plain language in BI's summary judgment brief putting AMS on notice that (1) BI sought a judgment of non-infringement of both claim 1 and claim 7 of the '611 patent, and (2) BI's argument was based in part on the difference between the TAD Processor and the AutoAlertHandler, AMS's failure to make its claim 7 argument was its own fault.  In finding that AMS waived the argument, the district court did not commit error at all, much less a clear error of judgment.  Thus, it did not abuse its discretion and this Court should affirm its waiver finding.

\* \* \*

Excising AMS's numerous waived arguments, there are no genuine issues of fact.  The BI TAD system does not contain a situation analyzer or any other component that queries historical data to determine the action to be applied to each message.  Neither the TAD Processor nor the AutoAlertHandler—either alone or together—ever query historical data in performing their respective tasks.  Indeed, both processors are entirely ignorant regarding past messages or data

relating to past messages, and AMS submitted no evidence that either processor takes past messages into account in determining (1) whether the current data warrants creation of an alert message (performed by the TAD Processor), or (2) the action to apply to the alert message (performed by the AutoAlertHandler). As such, the BI TAD system does not meet the Historical Data Limitation and the district court correctly held that BI was entitled to summary judgment of non-infringement of the '611 Patent as a matter of law.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant of summary judgment of non-infringement of the '149 Patent and the '611 Patent.

Dated:  February 6, 2015

Respectfully submitted,

/s/ Michael P. Manning
Timothy P. Getzoff
HOLLAND & HART LLP
One Boulder Plaza
1800 Broadway, Suite 300
Boulder, Colorado  80302

Michael P. Manning
HOLLAND & HART LLP
401 North 31st Street
Suite 1500
P.O. Box 639
Billings, Montana  59103-0639

*Counsel for Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. The following registered CM/ECF users were served by the appellate CM/ECF system:

    Jon R. Trembath
    Phillip S. Lorenzo
    James E. Dallner
    Allison S. Wallin
    Alexander C. Clayden
    LATHROP & GAGE LLP
    950 17th Street, Suite 2400
    Denver, CO  80202

    */s/ Michael P. Manning*
    Timothy P. Getzoff
    HOLLAND & HART LLP
    One Boulder Plaza
    1800 Broadway, Suite 300
    Boulder, Colorado  80302

    Michael P. Manning
    HOLLAND & HART LLP
    401 North 31st Street
    Suite 1500
    P.O. Box 639
    Billings, Montana  59103-0639

    *Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(B), the attached Appellees' Brief is proportionately spaced, has a typeface of 14 points or more, and contains 12,969 words.

/s/ *Michael P. Manning*
Timothy P. Getzoff
HOLLAND & HART LLP
One Boulder Plaza
1800 Broadway, Suite 300
Boulder, Colorado  80302

Michael P. Manning
HOLLAND & HART LLP
401 North 31st Street
Suite 1500
P.O. Box 639
Billings, Montana  59103-0639

*Counsel for Appellees*

7432952_8